**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ESTATE OF MARIANO VARGAS, *et al.*,<br>*Plaintiffs*,<br>v.<br>COUNTY OF HUDSON, *et al.*,<br>*Defendants*. | Civil Action No. 14-1048<br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This matter arises out of a tragic incident involving Mariano Vargas ("Mariano") and the Bayonne Police Department ("BPD"), when BPD Officers shot and killed Mariano while the officers were conducting a welfare check. Presently before the Court are motions for summary judgment filed by (1) Plaintiff and Counterclaim Defendant Linda Vargas ("Linda"), D.E. 165; and (2) Defendants the City of Bayonne ("Bayonne"), the BPD, Police Chief Robert Kupert, Officer David McCrae, Officer Carrey, Officer Ralph Scianni, Officer Anthony Larwa, Sergeant Paul Jamolawicz, Officer John Arndt, Captain Drew Sisk, Police Director O'Donnell, and Lieutenant Robert Desczynski, D.E. 166. The Court reviewed all submissions[1] made in support and opposition of the motions, and considered the motions without oral argument pursuant to Fed.

[1] Linda's brief in support of her motion for summary judgment ((D.E. 165-2) will be referred to as "Plf. Br."; Defendants' brief in opposition to Linda's motion (D.E. 167) will be referred to "Defs. Opp."; Linda's reply brief (D.E. 170) will be referred to as "Plf. Reply"; Defendants' brief in support of their motion for summary judgment (D.E. 166) will be referred to as "Defs. Br."; Plaintiffs' brief in opposition to Defendants' motion for summary judgment (D.E. 168) will be referred to as "Plfs. Opp."; and Defendants' reply brief (D.E. 169) will be referred to "Defs. Reply".

R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Linda's motion for summary judgment is **GRANTED** and Defendants' motion is **DENIED**.

## I. FACTS AND PROCEDURAL HISTORY

### A. Factual Background[2]

On March 21, 2012 two BPD officers shot and killed Mariano while they were conducting a "welfare check" on him. Mariano suffered from a schizoaffective disorder that "manifested itself with psychotic symptoms and periods of depression or mania." DSOMF ¶ 3. Mariano was diagnosed in 1998, and had periods of stability and instability. PSOMF ¶¶ 3, 6. In the years leading up to the incident at issue, Mariano's disorder was controlled by medication and he was "essentially free of his symptoms." PSOMF ¶ 17; DSMOF ¶ 13. Mariano had not gone off his medications in the five years before the incident. PSOMF ¶ 18. Mariano's wife, Linda, "normally [] ensured that her husband's pill box was filled and that he took his medication as prescribed." DSOMF ¶ 26.

On March 21, Linda was visiting the Vargas' daughter in North Carolina. Linda previously visited her daughter approximately three times without Mariano. Cert. of Counsel, Ex. 1 at T7:20-8:13, D.E. 170-1. Mariano was not answering Linda's phone calls on March 21 so Linda called her sister, Denise, and asked Denise to check on him. Linda suspected that Mariano was not answering the phone because he stopped taking his medication. PSOMF ¶¶ 19-20; DSOMF ¶ 27. When Denise checked on Mariano, she also did not receive any response from him. Denise's friend then suggested that Denise call Grace Joynt, Mariano's niece and a BPD officer. Denise

---

[2] The factual background is largely taken from Defendants' Statement of Undisputed Material Facts ("DSOMF") (D.E. 134-1) and Plaintiffs' Counterstatement of Material Facts ("PSOMF") (D.E. 141). In addition, because Defendants failed to respond to PSOMF, all facts in PSOMF are deemed admitted. *See* L. Civ. R. 56.1(a) (explaining that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion").

called Officer Joynt at approximately 6:30 p.m. PSOMF ¶¶ 21-22. Officer Joynt called the BPD and reported the need for a welfare check. *Id.* ¶ 23. Officer Joynt informed the BPD that Mariano may have stopped taking his medication and "they needed to get him to a hospital." DSOMF ¶ 32. Officer Joynt also requested that BPD officer Defendant McCrae be present at the scene because McCrae was involved in a prior incident involving Mariano and the BPD in 2003. *Id.* ¶ 30.

In 2003, Mariano barricaded himself inside his home while he was having a psychotic episode. Mariano had a knife, and was threatening to harm himself and anyone who tried approaching him. The BPD officers present during the 2003 incident contacted the Jersey City Medical Center Emergency Psychiatric Unit ("JCMC EPU"), as they had an experienced negotiator on staff. PSOMF ¶¶ 7-8. For several hours, the negotiator attempted to get Mariano to give up his knife peacefully and exit his trailer. *Id.* ¶ 8. Eventually, the BPD officers forcefully entered the Vargas' trailer by breaking down the door, and charged Mariano. The BPD officers attempted to use pepper spray to subdue Mariano but it had no effect. There was ultimately a "struggle" to subdue Mariano. Three BPD officers, including Officer McCrae, were injured during the struggle. PSOMF ¶ 11; DSOMF ¶¶ 11-12.

On March 21, 2012, BPD officers, including Officer McCrae, and an ambulance arrived at the Vargas' residence by 7:00 p.m. PSOMF ¶ 24. The BPD officers could see Mariano through a window but Mariano failed to respond to attempts to communicate. DSOMF ¶¶ 34, 37. In addition, either Officer Joynt or Denise gave Defendant Sergeant Jamolawicz a key to the Vargas' trailer. *Id.* ¶ 35; PSOMF ¶ 32. Every time that Defendant Jamolawicz tried to unlock the door with the key, Mariano re-locked the door from the inside. DSOMF ¶ 35.

The BPD has a written policy that provides "if an individual refuses the officer's recommendation of treatment and it is clear that the individual is a threat to himself or others, the member shall contact the . . . JCMC MPU to respond to the scene." PSOMF ¶ 52. The policy continues that the BPD officer "shall take the steps necessary to safeguard the scene and will stay in close proximity to the disturbed person and psychiatric evaluator while an assessment is made." *Id.* The BPD officers who responded to Officer Joynt's call for a welfare check did not follow the policy.[3] After attempting to communicate with Mariano for approximately twenty minutes, the BDP decided to forcefully enter the Vargas residence. PSOMF ¶ 39.

Two BPD officers physically broke the back door and at least six BPD officers entered the home. Defendant Arndt entered with his gun drawn, and Officer McCrae had a shield. DSOMF ¶ 45; PSOMF ¶ 40-41. According to Officer McCrae, when they entered the trailer, Mariano had a long knife in his hand and was advancing towards the officers. DSOMF ¶ 46. Plaintiffs disagree with Defendants' account that Mariano was holding the knife when the officers first encountered Mariano in the trailer. PSOMF ¶ 46. Within 15 to 30 seconds of the BPD officers' entrance, Officer Larwa shot twice at Mariano. DSOMF ¶¶ 46-55. Defendants state that Mariano continued to attack the officers, so Officer Arndt shot Mariano once in the chest and Officer Larwa directed two more shots at Mariano. *Id.* ¶¶ 56-57. Mariano died as a result of the gunshots. PSOMF ¶ 2.

[3] To this end, as is discussed below, the officers arguably did not believe that Mariano was a threat to himself or others when the officers first arrived at the scene. At the time, Mariano was not responding to the officers but, apparently, was also not indicating that he was a threat to himself. Yet, if accurate, these facts undercut any claim of exigent circumstances justifying a warrantless entry.

**B. Procedural History**

Plaintiffs - the Estate of Mariano Vargas,[4] Lisa M. Russell as executor of the Estate of Mariano Vargas, Lisa M. Russell, and Linda G. Vargas - filed suit on February 18, 2014, D.E. 1, and filed a First Amended Complaint ("FAC") on February 28, 2014, D.E. 3. The FAC asserts Section 1983 and New Jersey Civil Rights Act ("NJCRA") claims against Bayonne and the individual BPD Officer Defendants, in addition to multiple common law tort claims. D.E. 3. Defendants filed an answer to the FAC. D.E. 26. On February 27, 2018, Defendants were granted leave to file an amended answer that includes counterclaims against Plaintiff Linda Vargas for frivolous litigation and negligence. D.E. 110. Defendants filed their amended answer and counterclaims on March 1, 2018.[5] D.E. 111.

On February 19, 2019, the parties were granted leave to file motions for summary judgment as to certain Section 1983 and NJCRA claims, and the remaining counterclaim for negligence.[6] D.E. 158. The parties filed the instant motions on September 9, 2019. D.E. 165, 166.

[4] Plaintiff the Estate of Mariano Vargas does not have standing to assert claims in this matter. Rather, the claims here must be brought by the executor of the decedent's will or the *administrator ad prosequendum*. *Endl v. New Jersey*, 5 F. Supp. 3d 689, 696 (D.N.J. 2014) (citing N.J.S.A. 2A:31-2). Because standing involves subject matter jurisdiction, Plaintiff the Estate of Mariano Vargas is *sua sponte* dismissed as a Plaintiff in this matter. Lisa M. Russell, as executor of the Estate of Mariano Vargas, is also a Plaintiff in this matter and is a proper party to assert claims on behalf of Mariano Vargas' estate.

[5] Linda filed a motion to dismiss the counterclaims on March 22, 2018. D.E. 117. On February 19, 2019, the Court administratively terminated her motion and provided Linda with leave to file a motion for summary judgment as to the negligence counterclaim. D.E. 158. In addition, the Court dismissed Defendants' counterclaim for frivolous litigation after Defendants agreed to withdraw the claim. D.E. 153, 158.

[6] Plaintiffs agreed to withdraw Counts 1 through 3, 5 through 8, and 18 of the FAC, D.E. 152, which the Court then dismissed, D.E. 158.

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the

court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III. ANALYSIS

### A. Plaintiff Linda Vargas' Motion for Summary Judgment

Linda seeks summary judgment as to the negligence counterclaim asserted against her. Through the counterclaim, Defendants allege that Linda is liable for Mariano's death because she failed to ensure that Mariano was taking his medication. Linda maintains that Defendants seek to hold her liable based on a non-existent duty. Plf. Br. at 5-10.

In New Jersey, a party asserting a negligence claim must establish four elements: "(1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." *Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 212 N.J. 576, 594 (2013) (citations omitted). "The threshold inquiry in a negligence action is whether the defendant owed the plaintiff a duty of care." *Leonard v. Golden Touch Transp. of N.Y. Inc.*, 144 F. Supp. 3d 640, 644 (D.N.J. 2015) (quoting *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010)); *see also Fortugno Realty Co. v. Schiavone-Bonomo Corp.*, 39 N.J. 382, 393 (1963) ("To render defendants liable there must be found a breach of a duty, which duty, if observed, would have averted the plaintiff's injuries."). Under New Jersey law, "[w]hether a defendant owes a legal duty, as well as the scope of the duty owed, are questions of law for the court to decide." *D'Alessandro v. Hartzel*, 422 N.J. Super. 575,

579 (App. Div. 2011); *see also Velazquez ex rel. Velazquez v. Jiminez*, 172 N.J. 240, 263 (2002) ("The question of duty is one of law to be decided on a case-by-case basis.").

Ordinarily, "absent a special relationship, there is no duty to control a third person's conduct." *Champion ex rel. Ezzo v. Dunfee*, 398 N.J. Super. 112, 122 (App. Div. 2008). In this instance, Defendants ask this Court to create a new duty – under New Jersey law - that requires a spouse to ensure that his or her partner continues ongoing medical care. This Court declines to impose this novel duty on the facts presented here.

To determine whether a duty exists, courts "first consider the foreseeability of harm to a potential plaintiff, and then analyze whether accepted fairness and policy considerations support the imposition of a duty." *Jerkins ex rel. Jerkins v. Anderson*, 191 N.J. 285, 294 (2007) (internal citations omitted). In addition to foreseeability, courts consider the following factors: "the relationship of the parties; the nature of the risk; the ability to exercise care; and public policy considerations." *Desir ex rel. Estiverne v. Vertus*, 214 N.J. 303, 317 (2013). "Foreseeability as a component of a duty to exercise due care is based on the defendant's knowledge of the risk of injury." *J.S. v. R.T.H.*, 155 N.J. 330, 338 (1998). Whether the injury was foreseeable is an objective inquiry, and may be based on actual or constructive knowledge. *Id.* But "[e]ven if the risk is foreseeable, a legal duty does not necessarily arise." *Sacci v. Metaxas*, 355 N.J. Super. 499, 508 (App. Div. 2002).

As framed by Defendants' counterclaim, the risk of injury here is whether Mariano would stop taking his medication without Linda's supervision and suffer from a resulting injury. Defendants establish that Linda "normally" ensured that Mariano's pill box was filled and "that he took his medication as prescribed." DSOMF ¶ 26. While Mario had not stopped taking his medication in the five years before the incident, he previously went off his medication on occasion.

*See* PSOMF ¶¶ 17-18. Defendants, however, do not establish that the prior occasions when Mariano stopped taking his medication were in any way attributable to Linda. Rather, the parties provide no explanation as to why Mariano did not continue his medications, when it occurred, or provide any further information about the prior lapses. And critically, Linda visited her daughter approximately three times before the March 2012 trip. During each prior trip, Mariano did not travel with Linda and he provided for himself without incident. Cert. of Counsel, Ex. 1 at T7:20-8:13. Accordingly, Defendants fail to provide sufficient evidence for the Court to determine that Mariano's failure to take his medication without Linda's supervision was foreseeable.

Moreover, Defendants fail to provide any legal authority demonstrating that a duty might be appropriate here. Defendants discuss a number of cases that address the duty of a spouse to warn third parties about a spouse's dangerous proclivities. Defendants, however, fail to identify a single case in which a Court determined that a spouse has a duty to keep the other spouse safe under conditions similar to those in this case.

Defendants first rely on *J.S. v. R.T.H.*, which imposed a duty to warn of or prevent sexual abuse committed by a spouse. The New Jersey Supreme Court's decision was "[b]ased in large measure on the strong public policy of protecting children from sexual abuse." 155 N.J. at 351. The New Jersey Supreme Court also relied on "a plethora of statutes designed to prevent the sexual abuse of children," including N.J.S.A. 9:6-8.10. *Id.* at 343. The statute requires individuals who have reasonable cause to believe that child abuse occurred to report the abuse. *See* N.J.S.A. 9:6-8.10. The strong public policy basis, which is supported by statutory reporting requirements, simply is not present in this matter. Thus, *J.S.* does not aid Defendants.

Next, Defendants discuss a number of cases that involve the voluntary assumption of a duty, including *O'Neill v. Suburban Terrance Apartment, Inc.*, 110 N.J. Super. 541 (App. Div.

1970). *See* Defs. Opp. at 5-7. These cases address the scope of a voluntary assumption of a duty, not whether the Court should impose a duty in the first instance. Moreover, there is no evidence that Linda assumed such a duty here.[7] Although Linda "normally" set up Mariano's medication, she left him alone on prior occasions without supervision. In addition, "normally" does not equate to on every occasion. These cases, therefore, are also inapplicable.

Accordingly, Defendants fail to provide the Court with a legal or factual basis to impose a new duty here. Because no legal duty exist, Defendants cannot establish that Linda was in any way liable for Mariano's death. Linda's motion for summary judgment, therefore, is granted and Defendants' counterclaim is dismissed.

**B. Defendants' Motion for Summary Judgment**

Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 and the NJCRA, N.J.S.A. 10:6-2. Section 1983, in relevant part, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To prove a Section 1983 claim, a plaintiff must demonstrate that (1) a person deprived her of a right secured by the Constitution or federal law; and (2) the person who deprived her of that right

---

[7] To find an individual negligent based on a voluntarily assumed duty, there must also be proof of reasonable reliance by the injured party. *See Ceneviva v. Homes*, No. 09-2452, 2011 WL 2470596, at *3 (D.N.J. June 20, 2011) (quoting *Johnson v. Souza*, 71 N.J. Super. 240, 242-43 (App. Div. 1961)). Defendants have provided no evidence as to reasonable reliance.

acted under color of state law. *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *2 (D.N.J. July 29, 2016).

The NJCRA provides a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2. The "NJCRA was modeled after § 1983, [so] courts in New Jersey have consistently looked at claims under the NJCRA through the lens of § 1983 and have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart." *Velez*, 2016 WL 4107689, at *5 (internal quotations and citation omitted). Therefore, the Court considers Plaintiffs' Section 1983 and NJCRA claims together.

Here, Plaintiffs allege that Defendants violated Mariano's Fourth Amendment rights as incorporated to state and local government actors through the Fourteenth Amendment.

**1. Claims Against the Officer Defendants**

Plaintiffs' claim against the Individual Defendants focuses on the BPD officers' entry into Mariano's trailer without a warrant.[8] The Officer Defendants argue that there was not a

[8] Plaintiffs also allege that breaking into Mariano's home was an unlawful use of excessive force. Plfs. Opp. at 22-23. The Fourth Amendment guarantees people the right to be secure from unreasonable seizures. The use of excessive force against a person may constitute an unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Plaintiffs, however, provide no legal support for their argument that the Fourth Amendment protection from the use of excessive force extends beyond the person and to a structure, and the Court is not aware of any. Consequently, the Court focuses its inquiry solely on Plaintiffs' warrantless entry allegations.

constitutional violation, and even assuming there was, they are entitled to qualified immunity.[9] Defs. Br. at 11-15; Defs. Reply at 9-10. Given that these issues are intertwined, the Court addresses them together.

Qualified immunity can protect a municipal officer from liability in a Section 1983 case. *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). "Qualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014). A court must engage in the following two-part inquiry to determine whether qualified immunity applies: (1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that defendant's conduct violated a constitutional right; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts have discretion to consider either prong of the two-part analysis first. *Id*. at 236.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Moreover, qualified immunity is an affirmative defense for which a defendant bears the burden of proof. *See Goldenbaum v. DeLorenzo*, No. 08-1127, 2010 WL 5139991, at *11 (D.N.J. Dec. 10, 2010). In deciding qualified immunity questions at summary judgment, a court must view the material facts in the light most favorable to the plaintiff. *Id*.; *see*

[9] To establish liability for a defendant under Section 1983, that defendant "must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Although Defendants do not seek summary judgment on these grounds, the Court notes that Plaintiffs' claims are asserted against Defendants as a whole, and Plaintiffs fail to clearly explain how each Defendant was personally involved in the March 21 incident.

*also Scott v. Harris*, 550 U.S. 372, 378 (2007). Thus, summary judgment may be granted to an officer if, when interpreting the facts in the light most favorable to the non-moving party, the court determines that the evidence does not support a violation of a clearly established constitutional right. *Mitchell v. Forsyth*, 472 U.S. 511, 546 (1985) (stating that "when a trial court renders a qualified immunity decision on a summary judgment motion, it must make a legal determination very similar to the legal determination it must make on a summary judgment motion on the merits"); *see also Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Scott*, 550 U.S. at 378.

**a. Constitutional Violation**

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures inside someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006) (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*, 445 U.S. 573, 586 (1980)). The state has the burden to demonstrate that an exception to the warrant requirement is present. *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014).

Defendants maintain they had consent to enter Mariano's residence without a warrant. Defs. Reply at 9. Specifically, Defendants argue that they reasonably believed they had consent to enter the premises because Linda asked Officer Joynt to ensure Mariano's well-being, and Officer Joynt provided a key and encouraged the BPD officers to enter the trailer. *Id.* Voluntary consent is an exception to the warrant requirement, and a third party may provide consent if she has authority over the premises or effects that are searched. *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011). However, consent from a third party does not trump "the express refusal of

consent by a physically present resident." *Id.* (quoting *Georgia v. Randolph*, 547 U.S. 103, 120 (2006)).

Here, the *undisputed* material facts reflect that Mariano did not consent to the BPD's warrantless entry into his home. Mariano never gave verbal consent, and no party contends otherwise. In addition, every time Defendant Jamolawicz tried to unlock the door, Mariano locked it again from the inside. DSOMF ¶ 35. Thus, even assuming that Linda provided valid consent to enter the residence through Officer Joynt, which the Court is not deciding,[10] Mariano's failure to provide consent through his conduct negated the BPD's ability to enter without a warrant. As a result, the consent exception does not apply here.

Defendants also rely on the exigent circumstances exception. Exigent circumstances may justify a warrantless intrusion when police "reasonably believe that someone is in imminent danger." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). Imminence, or "the existence of a true emergency" is critical. *Mallory*, 765 F.3d at 384. Here, Officer Joynt called the BPD to request a welfare check on Mariano. DSOMF ¶ 29. Officer Joynt informed the BPD that Mariano may not have been taking his medication and needed to go to the hospital. *Id.* ¶¶ 32-33. Officer Joynt also told the BPD that Mariano could become violent when he was not taking his medications. *Id.* ¶ 32. One of the responding BPD officers, Officer McCrae, was also independently aware of Mariano's mental illness from the 2003 incident during which McCrae was injured. *Id.* ¶ 31. However, only a welfare check was requested. While *possibilities* were suggested – Mariano potentially not taking his medication and, if so, Mariano could potentially

---

[10] The Court notes that even under Defendants' account of the incident, it does not appear that Linda ever spoke with Officer Joynt. *See* DSOMF ¶¶ 27-28 (explaining that Linda called her sister, and that Linda's sister then called Officer Joynt for help).

become violent – there was no indication that Mariano had in fact stopped taking his medication or was in fact violent.

Once at the trailer, BPD officers tried to communicate with Mariano, but Mariano did not respond and he remained in the locked trailer. *Id.* ¶¶ 34-35. In addition, Plaintiffs contend that although Mariano was unresponsive to the BPD, while the BPD remained outside of the trailer, the BPD officers did not observe any behavior indicating that Mariano was a threat to himself or others. PSOMF ¶¶ 35-37. In fact, no one besides Mariano was in, or known to be in, the trailer. The BPD officers could see Mariano through the windows, *id.* ¶ 37, but did not know that he had a knife until they had broken into the trailer, *id.* ¶ 47. Based on this evidence, a reasonable jury could conclude that exigent circumstances did not exist due to lack of any indication of imminent danger when the BPD officers decided to break into the trailer. Accordingly, a jury could also conclude that a constitutional violation occurred when the BPD officers entered the trailer without a warrant.

**b. Clearly Established Right**

In their motion for summary judgment, Defendants focus on whether the use of force violated a clearly established right. Defs. Br. at 12-16. This argument puts the cart before the horse because the threshold question is whether the BPD officers were legally inside the trailer when they decided to use deadly force. Defendants, however, fail to address whether the need for a warrant or the exceptions to the warrant requirement were clearly established at the time of the incident. As a result, Defendants have not shown that they are entitled to qualified immunity at this time. Consequently, Defendants motion for summary judgment is denied as to the Section 1983 and NJCRA claims against the Individual Defendants.

**2. Count 11 - Negligent Training and Supervision**

Defendants also seek summary judgment dismissing Count 11, which asserts a claim for negligent training and supervision.[11] While not at all apparent from the FAC, the parties treat Count 11 as a *Monell* claim. *See* Defs. Br. at 16; Plf. Br. at 12. The Court will therefore do the same.

A municipality may be liable under Section 1983 "if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Township*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978)). In addition, a *Monell* claim may also be premised on a municipality's failure to train, supervise, and discipline its employees. Plaintiffs here assert a failure to train *Monell* claim – specifically that the BPD failed to train officers on how to perform welfare checks and interact with people suffering from mental illness.

For claims involving police officers, the alleged failure to train can only serve as a basis for Section 1983 liability where "the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.

---

[11] Plaintiffs initially asserted claims against Bayonne and the BPD, but now contend that the BPD is the real party in interest. Although Defendants do not seek summary judgment on these grounds, the Court notes that administrative arms of a municipality such as police departments and the municipality itself are treated as a single entity for purposes of Section 1983. *Bonenberger v. Plymouth Township*, 132 F.3d 20, 29 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability."). As a result, local police departments are not subject to suit under Section 1983 or the NJCRA "because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." *See Padilla v. Township of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (finding that in "Section 1983 actions, police departments cannot be sued in conjunction with municipalities) (internal quotation omitted); *Castoran v. Pollak*, No. 14-2531, 2017 WL 4805202, at *7 (D.N.J. Oct. 25, 2017) (dismissing Section 1983 and NJCRA claims asserted against local police department).

1999)). In addition, "'the deficiency in training must have actually caused' the constitutional violation." *Id.* at 223 (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)).

"Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas*, 749 F.3d at 223 (internal quotations, citations, and brackets omitted). As discussed, Plaintiffs contend that the BPD failed to train officers on how to conduct welfare checks and interact with individuals with mental illness. The BPD does not have any formal written policies that address conducting a welfare check, PSOMF ¶ 61; and nobody within the department received any training on how officers should manage people suffering from psychiatric problems, *id.* ¶ 62. The BPD does have a written policy stating that "if an individual refuses the officer's recommendation of treatment and it is clear that the individual is a threat to himself or others, the member shall contact the . . . JCMC MPU to respond to the scene." PSOMF ¶ 52. There is no question that the BPD officers present on March 21 did not adhere to this policy and no officer received any training regarding this policy. Thus, Plaintiffs provide sufficient evidence demonstrating that training did not occur. Plaintiffs, however, provide no evidence of a pattern of similar constitutional violations, which is typically necessary to establish deliberate indifference.

But "in certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (internal quotations omitted) (citing *Canton*, 489 U.S. at 390 n.10). "Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas*, 749 F.3d at 223–24 (internal quotation, citation, and bracket omitted). In *Thomas*, the plaintiff was seriously injured during a

fight in prison. To support his *Monell* claim, the plaintiff provided evidence demonstrating that fights regularly occurred in the prison where he was detained. *Id.* at 220, 225. While Thomas' evidence of other fights was "not sufficient to create a pattern of violations," the Third Circuit determined that "they are relevant to whether his injury was a 'highly predictable consequence' of the failure to train on de-escalation techniques for single-incident liability." *Id.* at 225. The evidence of prior fights, in addition to an expert's opinion that the failure to provide training "was a careless and dangerous practice not aligned with prevailing standards" created a material issue of fact as to whether the defendant county acted with deliberate indifference. The Circuit continued that because corrections officers have no reason to know how to de-escalate a conflict to avoid a constitutional injury, the failure to train officers on a situation that frequently occurred was "akin to 'a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Id.* (quoting *Board of Cty. Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). As a result, the Third Circuit concluded that summary judgment was not appropriate as to the county defendant. *Id.* at 227.

In this instance, the BPD had a prior interaction with Mariano in 2003 when Linda called Officer Joynt for help because Mariano was having a psychotic episode. PSOMF ¶¶ 7-11. As a result, the BPD was aware of Mariano's mental health issues. *Id.* ¶ 66. In fact, Officer McCrae was present at the incident at issue here and in 2003. *Id.* ¶¶ 30-31. Further, Defendant Sisk, who was also present at the incident at issue, testified that the BPD received calls for welfare checks on emotionally disturbed individuals "fairly frequently." Sisk Dep T24:21-25:5. This evidence creates a material issue of fact as to whether BPD policy makers knew that officers were likely to be faced with a situation involving people with mental illness. In addition, given the inherent

unpredictability of a person in the middle of a psychotic episode,[12] it is a predicable consequence that an individual who lacks training as to how to adequately deal with mental illness would violate a mentally ill individual's constitutional rights when required to interact with the individual. Finally, like *Thomas*, Plaintiffs' liability expert opines that the BPD failed to train its officers in nationally recognized policies and procedures for dealing with parties in mental crisis. PSOMF ¶ 74. Accordingly, there is a material issue of fact as to whether the BPD acted with deliberate indifference.

Defendants argue that the BPD's training was appropriate because it followed the Attorney General's guidelines in training BPD officers. Defs. Br. at 19. Defendants provide no facts to support this statement, and the AG's guidelines do not provide any specific instructions or guidance on handling people with mental illness. Defendants also fail to provide any legal support for their argument that national guidance is irrelevant in the current situation. In fact, Defendants argument is undercut by *Thomas*. As discussed, in *Thomas*, the Third Circuit determined that the plaintiff's expert opinion evidence, which relied on national standards for prison training, was relevant to whether the county acted with deliberate indifference. *Thomas*, 749 F.3d at 225.

Assuming that a jury finds that a constitutional injury occurred here, there are sufficient facts by which a reasonable jury could also conclude that the lack of training caused Plaintiffs' injury. Namely, Defendants maintain that "[t]he decision to enter without calling medical assistance was made on past experience with police interactions with Mr. Vargas and the fact that he was not communicating in any way with anyone on the scene." Defs. Br. at 17; *see also*

[12] The Court uses psychotic episodes merely as an example. Beyond psychotic episodes – when a person is experiencing a break with reality – persons undergoing the symptoms of other forms of mental illness can present the same or similar challenges to police officers and first responders, such as a clinically depressed person who is suicidal.

DSOMF ¶¶ 40-41; 60. But Plaintiffs' medical expert, Dr. First, opines that "it was erroneous on the part of the BPD to assume that Mariano's previous interactions with the BPD in 2003 were directly applicable or relevant to the proper course of action during the Incident." PSOMF ¶ 70. Thus, a jury could find that had the BDP officers received proper training, they would have known that forcibly entering Mariano's trailer without a warrant was not the appropriate action to ensure Mariano's well-being. These material issues of fact preclude granting summary judgment to Defendants for the *Monell* claim.

**3. Statutory Immunity**

Defendants argue that they are immune from suit pursuant to the New Jersey Tort Claims Act (the "NJTCA") and the community caretaking doctrine.[13] Defs. Br. at 25-28. Generally, the NJTCA provides public employees such as police officers with immunity from tort liability. N.J.S.A. 59:3-3 provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." The NJTCA, however, does not provide immunity if the conduct at issue "constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14. Willful misconduct "is not immutably defined but takes its meaning from the context and purpose of its use." *Fielder v. Stonack*, 141 N.J. 101, 124 (1995). It falls somewhere "between simple negligence and the intentional infliction of harm." *Id.* (quoting *Foldi v. Jeffries*, 93 N.J.

[13] Defendants appear to believe that the NJTCA and community caretaking doctrine afford them complete immunity from this suit. The NJTCA immunities, however, do not apply to Section 1983 claims. *See Bostrom v. N.J. Div. of Youth & Family Servs.*, 969 F. Supp. 2d 393, 418 (D.N.J. 2013) ("[I]t is well established that the New Jersey Tort Claims Act provides no immunity to public officers sued under federal law." (citing *Tice v. Cramer*, 133 N.J. 347, 375 (1993))). The same is true as to Defendants' arguments under the community caretaking doctrine. *See Smith v. Township of Warren*, No. 14-7178, 2016 WL 7409952, at *17 (D.N.J. Dec. 22, 2016) (explaining that "[t]he Supremacy Clause of the United States Constitution dictates that a state statute, such as the TCA, cannot provide immunity from a claim under a federal statute").

533, 549 (1983)). While willful misconduct "need not involve the actual intent to cause harm, there must be some knowledge that the act is wrongful." *Id.* (internal citation omitted). Moreover,

> to satisfy the requirement of willfulness or wantonness there must be a "positive element of conscious wrongdoing." Our cases indicate that the requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.

*Id.* (quoting *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 414 (1962)).

Defendants maintain that they were forced to make a quick decision about whether Mariano posed a danger to himself or others. When viewed in the moment, Defendants argue that the Individual Defendants' conduct was "objectively reasonable and made in good faith." Defs. Br. at 26. While this might be an appropriate conclusion if the jury was only tasked with considering Defendants' use of deadly force once the BPD officers already entered the trailer, Defendants overlook what proceeded that interaction. When the Individual Defendants first encountered Mariano, they could see him through the window of the Vargas' trailer. The BPD Defendants did not observe a weapon and Mariano did not appear to be an imminent threat to himself or others. Yet, Defendants decided to forcefully enter Mariano's trailer, DSOMF ¶ 45, PSMOF ¶ 41, instead of following BPD policy by calling the JCMC EPU or obtaining a warrant. PSOMF ¶ 52. In light of these facts, a reasonable jury could conclude that the BPD officers acted with willful misconduct, rather than in good faith. Therefore, the Court denies Defendants' motion for summary judgment on these grounds.

Defendants also maintain that they are immune from suit under the community caretaking doctrine, citing N.J.S.A. 30:4-27.7. Defs. Br. at 27. The statute provides as follows:

> A law enforcement officer . . . acting in good faith pursuant to P.L. 1987, c. 116 and P.L. 2009, c. 112[14] *who takes reasonable steps* to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treatment is immune from civil or criminal liability.

N.J.S.A. 30:4-27.7(a) (emphasis added). Again, there are material issues of fact as to whether the Individual BPD Defendants acted reasonably. *Contra Catlett v. N.J. State Police*, No. 12-153, 2015 WL 9272877, at *4 (D.N.J. Dec. 18, 2015) (dismissing state law claims due to N.J.S.A. 30:4-27.7 because there was no indication that defendant acted in bad faith or unreasonably). Accordingly, summary judgment is denied to Defendants under either statute.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff Linda Vargas' motion for summary judgment (D.E. 165) is **GRANTED**, and Defendants' motion (D.E. 166) is **DENIED**. An appropriate Order accompanies this Opinion.

Dated: June 26, 2020

John Michael Vazquez, U.S.D.J.

[14] P.L. 1987, c. 116 and P.L. 2009, c. 112 address the involuntary commitment of individuals with mental illness.